UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM A. FEGLEY, SR.,          :
Plaintiff,                       :          NO. 1:13-CV-1760
                                 :
v.                               :          (KANE, J.)
                                 :          (SCHWAB, M.J.)
CAROLYN W. COLVIN,               :
Acting Commissioner of           :
Social Security,                 :
Defendant.                       :

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION AND PROCEDURAL HISTORY.

Plaintiff William A. Fegley, Sr. ("Fegley") appeals the September 15, 2011,

adverse decision denying his application for disability insurance benefits ("DIB")

under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433. *Doc.* 1.

Fegley applied for DIB on November 17, 2009, alleging that he has been disabled

since January 14, 2006, in large part due to pain in his lower back. *Tr.* 11.[1]  The

Social Security Administration ("SSA") denied Fegley's claim initially on June 9,

2010. *Tr.* 42.  Fegley timely filed a request for a hearing on July 28, 2010, which

was thereafter held before Administrative Law Judge ("ALJ") Geoffrey Casher

("Casher") on May 17, 2011, in State College, PA. *Id.*  On September 15, 2011,

---

[1] "Tr." refers to the transcript from the Social Security Administration and appears
as Document 6 and its attachments on the ECF docket report.  The pinpoint
citations to the transcript refer to the Bates-stamped number in the lower right-
hand corner of each page.

the ALJ denied Fegley's claim for DIB.  *Tr.* 39-53.  Thereafter, Fegley requested review by the Appeals Council of the Office of Adjudication and Review ("Appeals Council"), which denied the request on April 24, 2013, rendering the ALJ's decision the final decision of the Commissioner of Social Security with respect to Fegley's claims for DIB.  20 C.F.R. § 404.900(a)(4)-(5).

Fegley presents three issues for this appeal.  First, Fegley argues that the ALJ erred by failing to afford appropriate weight to his treating physicians.  Specifically, Fegley argues that the opinions of Dr. Andrew Renaud ("Dr. Renaud"), Dr. Michael Murray ("Dr. Murray"), and Dr. Steven Wolf ("Dr. Wolf") were not considered appropriately.  Second, Fegley argues that the ALJ's decision regarding his subjective complaints and credibility was not supported by substantial evidence.  Third, Fegley argues that the ALJ erred when relying upon the Vocational Expert's ("VE") response to a hypothetical question that did not encompass all of his limitations.

The Commissioner answered the complaint on September 6, 2013.  *Doc.* 5.  Fegley filed a brief in support of his appeal on October 21, 2013.  *Doc.* 7.  On November 19, 2013, the Commissioner filed a brief urging that the court affirm the ALJ's decision.  *Doc.* 8.  Fegley filed a reply brief on December 3, 2013.  *Doc.* 9.  The case is now referred to the undersigned for pretrial management and the preparation of a Report and Recommendation.  Upon consideration of the entire

record submitted by the parties, and for the reasons set forth below, we recommend that the Commissioner's final decision be **AFFIRMED**.

## II.  SUMMARY OF THE ADMINISTRATIVE PROCEEDINGS.

Fegley was born on November 15, 1967, and was 39 years old when he initially filed for DIB on November 17, 2009.  *Tr.* 42, 64.  Fegley is considered a "younger person" under the Social Security Regulations ("Regulations"); therefore, his age presents little or no barrier to his adjustment to alternative employment.  20 C.F.R. § 404.1563(c).  He has a Bachelor's of Science in health and physical education, and resides in Spring Mills, Pennsylvania with his wife, five children, and sister-in-law.  *Tr.* 64-65.

Fegley was last employed on April 9, 2007.  *Tr.* 64.  He worked for Direct TV in Hollidaysburg, PA and commuted one hour and 15 minutes.  *Id.*  He worked in the office, and his job consisted of plugging in Direct TV boxes to ensure that they worked properly and entering data into a computer using his right hand.  *Tr.* 68.  He worked on a full-time basis and received no complaints regarding his job performance from his supervisors.  *Tr.* 69.  He has not worked since the conclusion of his employment with Direct TV.  *Id.*  Prior to his employment with Direct TV, Fegley worked as a sorter from 1992 to 2000, a counter worker from 2001 to 2002, a car salesman from April to May 2003, and a fork truck driver from June to December 2003.  *Tr.* 250.

In his decision, the ALJ proceeded through all steps of the five-step sequential evaluation process. The ALJ found that Fegley met the insured status requirements of the Act through September 30, 2010. *Tr.* 44. Ultimately, the ALJ concluded that Fegley was not under a disability, as it is defined by the Act, at any time between his alleged onset date of January 14, 2006, through the date last insured. *Tr.* 42.

Following the ALJ's denial of his claims, Fegley sought review of the ALJ's decision by the Appeals Council. On April 24, 2013, the Appeals Council denied Fegley's request. *Tr.* 1-4. Therefore, the ALJ's September 15, 2011, decision denying Fegley's claims is the "final decision" of the Commissioner subject to judicial review by this Court under the Act. 20 C.F.R. § 404.981.

To receive benefits under Title II of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 2 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a). Furthermore:

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate

4

area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1383c(a)(3)(B).

In addition to the above-listed requirements, to receive benefits under Title II of the Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. §404.131(a).

It is the responsibility of the ALJ to determine whether a claimant has met the statutory prerequisites for entitlement to benefits. In making this determination, the ALJ employs a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). As part of this analysis the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. § 404.1520. If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed any

further.  *See* 20 C.F.R. § 404.1520(a)(4).  Moreover, between steps three and four of this process, the ALJ must determine the claimant's residual functional capacity ("RFC") as defined by 20 C.F.R. § 404.1545.  20 C.F.R. § 404.1520(e).

The claimant bears the initial burden of demonstrating that he or she has a medically determinable impairment that prevents him from engaging in past relevant work.  42 U.S.C. § 423(d)(5); 42 U.S.C. § 1382c(a)(3)(H)(i); 20 C.F.R. § 404.1512.  Once the claimant has satisfied his or her burden at steps one through four, it is incumbent upon the ALJ to show that jobs exist in the national economy that the claimant could perform that are consistent with his age, education, work experience, and RFC.  20 C.F.R. § 404.1512(f).

In this case, the ALJ found that Fegley met the insured status requirement under Title II of the Act through September 30, 2010.  *Tr.* 44.  He then proceeded through steps one through five of the sequential evaluation process.  Ultimately, the ALJ concluded that Fegley was not disabled at any time between January 14, 2006, his alleged onset date, and September 30, 2010, the date last insured.  *Tr.* 53.

At step one of his evaluation, the ALJ found that Fegley did not engage in any substantial gainful activity from his alleged onset date of January 14, 2006, through his date last insured of September 30, 2010.  *Tr.* 44.  At step two of his evaluation, the ALJ found that Fegley had the following severe impairments:  De Quervain's tenosynovitis of the left wrist, lumbar degenerative disc disease,

cervical spine degenerative disc disease with a bulging disc, tension headaches, and an adjustment disorder with anxiety and depression. *Id.* The ALJ found that these impairments were not slight and had more than a minimal impact on Fegley's RFC. *Id.*

The ALJ did not find the injuries to Fegley's left ankle or right shoulder to constitute severe impairments. *Tr.* 45. In making this finding, the ALJ relied on Dr. Paul Sherbondy's ("Dr. Sherbondy") report dated December 17, 2010, opining that Fegley had normal range of motion, full shoulder range of motion, and normal strength. *Tr.* 506. The ALJ did not find other significant evidence regarding left ankle degenerative joint disease or right shoulder pain in concluding these impairments to be non-severe. *Tr.* 45.

At step three of his evaluation, the ALJ found that Fegley did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Specifically, the ALJ found the impairments did not meet or equal any of the criteria set forth in Listing 1.00 Musculoskeletal System, 11.00 Neurological, and 12.00 Mental Disorders. *Id.* The ALJ referenced a report by Dr. Murray dated May 18, 2010, in which Dr. Murray opined that Fegley had a normal gait, no atrophy, normal sensation, normal pulses, normal elbow, wrist, hand, and knee ranges of motion, and basically normal shoulder range of motion. *Tr.* 46.

Regarding the possibility of a mental impairment, the ALJ highlighted Fegley's ability to prepare meals, grocery shop, drive, interact with others appropriately, watch television, help children with homework, perform simple and routine job tasks, and respond appropriately to questions, as evidence that Fegley did not meet the Mental Disorder Listing. *Tr.* 47. Further, the ALJ noted that the evidence failed to establish that Fegley was unable to function independently outside the area of his home. *Id.*

Prior to step four, the ALJ found that Fegley had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and placed the following limitations on Fegley:

> [L]ift and carry 20 pounds occasionally and 10 pounds frequently. He could stand and walk 3 hours in an 8 hour workday. He could perform frequent bilateral pushing and pulling with his upper extremities. He was limited to occasional lower extremity left pedal control. He had to be accorded a sit-stand option to change positions approximately every twenty to thirty minutes. He could occasionally bend, balance, stoop, kneel, crouch, and crawl. He could occasionally climb ramps and stairs, but could not climb ladders, ropes, and scaffolds. He could not perform overhead reaching. He could not be exposed to extreme cold. He could not be exposed to vibration. He could not be exposed to hazardous conditions such as unprotected heights, dangerous machinery, or uneven surfaces. He was limited to simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few work place changes. He could not perform production-rate assembly line type work.

*Tr.* 48.

In light of Fegley's limitations, at step four, the ALJ concluded that Fegley could not perform the duties associated with his past relevant job of satellite dish installer. *Tr.* 51. The VE also concluded that this job exceeded Fegley's RFC by requiring medium exertion. *Id*. At step five of his evaluation, the ALJ considered Fegley's age, education, work experience, and RFC in determining that jobs exist in significant numbers in the national economy that Fegley can perform. *Tr.* 52. The ALJ discussed the occupations of garment sorter, folder, cuff folder, and surveillance system monitor in his report. *Id*. The ALJ concluded that Fegley was not under a disability as defined in the Act, and Fegley was not disabled at any time between the alleged onset date of January 14, 2006, through September 30, 2010, the date Fegley was last insured. *Tr.* 53.

## III. FACTUAL BACKGROUND.

### A. Physical Medical History.

Fegley argues that he suffers from a variety of physical injuries. *Doc.* 7 at 1. Specifically, Fegley asserts that he has injuries to his lower back, neck, right shoulder, left arm, left wrist, hands, and left ankle. *Tr.* 83. Fegley traces his lower back injury to a car accident that occurred on December 13, 1996. Fegley saw orthopedic surgeon Dr. Wolf, who initially evaluated Fegley for his lower back injury on March 20, 1997. *Tr.* 583. Dr. Wolf described Fegley as a "well nourished gentleman in no acute distress" with fairly good posture. *Id*. Dr. Wolf

noted that Fegley's x-rays showed some mild spondylosis at L3-4 and the L5-S1area appeared narrow.  *Id*.  Fegley was diagnosed with a herniated disc at L5-S1 on his left side and did not require surgery.  *Tr.* 583-584.  Fegley returned to Dr. Wolf in 2012, alleging a worsening of his lower back and neck conditions.  *Tr.* 28.

On March 27, 2012, Dr. Timothy Eckel ("Dr. Eckel") performed a lumbar discogram on Fegley at Dr. Wolf's request.  *Tr.* 22-23.  Dr. Eckel conducted the discogram at the L2-L3 through L5-S1 levels.  *Tr.* 22.  Dr. Eckel did not find any significant pain provocation at the L2-3, L3-4, or the L4-5 level.  *Tr.* 23.  The lumbar discogram demonstrated a major discogenic pain mechanism at the L5-S1 intervertebral level.  *Id.*  On August 14, 2012, Dr. Wolf completed a Physical Residual Functional Capacity Questionnaire ("RFC Questionnaire).  Dr. Wolf diagnosed Fegley with severe degenerative disc disease with spondylosis of the lumbro-sacral spine.  *Tr.* 586.

Fegley also saw Dr. Jyotish Grover ("Dr. Grover"), a pain management specialist.  Dr. Grover examined Fegley on April 13, 2011, due to an increase in pain symptoms.  *Tr.* 504.  Dr. Grover noted that Fegley underwent a left L3, L4, and L5 facet rhizotomy in 2005 with 70-80% resolution of all his symptoms and did not require surgery.  *Id*.  Dr. Grover found that the motor strength of Fegley's lower extremities revealed a diminished left hallux dorsiflexion as well as a left hallux plantar flexion at 4 out of 5.  *Tr.* 505.  According to Dr. Grover's notes,

Fegley could not recall when his pain started to recur, but noticed that it increased significantly from 2010 to 2011. *Tr.* 504. Fegley stated to Dr. Grover that his lower back pain radiates across his hips, buttocks, and posterior thighs. *Id*. Dr. Grover opined that Fegley suffered from a history of lumbar disc herniation, lumbosacral radiculopathy, and lumbar spondylosis. *Tr.* 505.

Fegley received physical therapy from Dr. Renaud from March 17 to July 13, 2010, to address issues pertaining to Fegley's lower back, right shoulder, and neck. *Tr.* 530-556. Fegley reported to Dr. Renaud that he injured his right shoulder and neck when he slipped and fell on ice and landed on a railing. *Tr.* 537. Additionally, Dr. Sherbondy treated Fegley for his left wrist, elbow and ankle on July 14, 2008, at the request of Dr. Gregory Billy ("Dr. Billy"). *Tr.* 506-525. On July 14, 2008, Dr. Sherbondy noted that Fegley fell off of a ladder and caught his elbow while landing on his left side. Dr. Sherbondy did not find any arthritis, acute fracture, or joint space narrowing in Fegley's ankle, and there was no arthritis or fracture in Fegley's wrist or elbow. *Tr.* 521. On December 17, 2010, Dr. Sherbondy noted that Fegley had good range of motion in his shoulder, and strength was normal. *Tr.* 506. Dr. Billy reviewed an MRI of Fegley's cervical spine and found some central bulging and narrowing in the left neural foramen at the C5-C6 level. *Tr.* 559.

Dr. Murray performed a consultative examination of Fegley on May 18, 2010. *Tr.* 405-418. Dr. Murray noted that Fegley has degenerative disc disease of the lumbar spine as well as the cervical spine, and has de Quervain tenosynovitis in his left wrist that is likely traumatic in nature. *Tr.* 409. Dr. Murray did not find any atrophy in Fegley's extremities and observed Fegley walk approximately 120 feet without assistance and without limp. *Tr.* 408.

### B. Mental Health History.

Fegley was referred to the Pennsylvania State Psychological Clinic ("Clinic") and had an initial assessment on March 17, 2010. *Tr.* 561. Fegley was referred to the Clinic because of anxiety and depression due to financial difficulties and inability to work. *Id.* Counselor Lauren Szkodny ("Szkodny") noted that Fegley worried about providing for his family and staying active with his children. *Id.* Counselor Szkodny also noted that Fegley "participates in the upkeep of his home and the care of his children while his wife works during the day." *Tr.* 562. Fegley was diagnosed with adjustment disorder with mixed anxiety and depressed mood. *Tr.* 564-565. Fegley continues to receive therapeutic services at the Clinic. *Tr.* 66-67.

### C. Fegley's Hearing Testimony.

Fegley, Attorney Mark Weaver, VE Mitchell Schmidt, and ALJ Casher attended the May 17, 2011, administrative hearing. *Tr.* 59. At the hearing, Fegley

testified that he last worked for Direct TV on April 9, 2007. *Tr.* 64. His job with Direct TV consisted of checking satellite boxes to make sure they worked properly. *Tr.* 68. Fegley plugged in boxes to see if they operated and marked each box to identify whether it worked. *Id.* Fegley also typed data into a computer to keep a record of his work. *Id.* Fegley testified that he "pecked" the information into the computer with his right hand because he could not use his left hand at all. *Id.*

Fegley, who worked in Direct TV's Hollidaysburg office, stated that he voluntarily terminated his employment with Direct TV in 2007 due to the one hour and 15 minutes commute to work. *Tr.* 64, 68-69. Fegley testified that he was not working in his "home area" and asked his employer for extra compensation to help pay for gas. *Tr.* 68. When asked if he terminated employment because of the distance, Fegley responded "yes." *Tr.* 68-69. Fegley testified that he worked full-time for Direct TV and did not receive any complaints regarding his job performance. *Tr.* 69.[2]

Regarding his physical injuries, Fegley stated that his biggest problem is his lower back. *Id.* Specifically, Fegley referenced the L5-S1 region and described

---

[2]    In his Reply Brief, Fegley argues that the Commissioner mischaracterizes the reason he left his job as solely because of his commute. *Doc.* 9 at 1. We disagree. Fegley's contentions that he left his job because he was experiencing physical symptoms are belied by his testimony at the hearing where he specifically states that he left his job because of the commuting distance and further intimates that the cost of gas and the fact that he was not hired for that location were factors. *Tr.* 68-69.

the pain as "pinching." *Id.* He also stated that his back pain shoots down his lower leg, giving him further problems. *Id.* Fegley testified that he traces his lower back injury to a car accident that occurred on December 13, 1996, while he was driving home from work and was rear-ended. *Id.* He went to the hospital but was not admitted for his injuries. *Tr.* 70. Fegley also testified that he reinjured his back after his initial accident while twisting to pick up items at work, and further injured his back after he was in another car accident. *Id.*

Fegley described his back pain as never-ending, but stated it varies from "dull" to "sharp" depending on the day. *Tr.* 71. Although he testified that he is in constant pain, his doctors never recommended surgery. *Tr.* 71-72. Fegley stated that it is difficult for him to sit for a long period of time, and he must change positions every 20 – 30 minutes by either lying down or walking. *Tr.* 72.

Fegley also testified that he has trouble walking and cannot walk long distances. When asked by the ALJ how long he could walk without needing to change positions, Fegley responded, "maybe 75 yards." *Tr.* 74-75. Further, Fegley testified that stairs are an issue for him. *Tr.* 75. He has two sets of stairs in his home but stated that he mostly remains on the first floor. *Id.* Although he reported that he does not use the stairs in his home often, he acknowledged that he goes up the stairs when needed to assist his wife. *Tr.* 76.

14

In addition to his lower back issues, Fegley stated that his next biggest issue is his neck.  Specifically, Fegley testified that he has a bulging disk in C3, C4, C5, and C6.  *Tr.* 77.  Fegley further testified that he gets headaches and numbness in both hands every day, varying in severity and duration.  *Tr.* 77 – 78.

Fegley traces his neck problems to February 2010, when he fell on a patch of ice while walking on stairs and landed on the stair railing with his right shoulder.  *Tr.* 78.  According to Fegley, his neck then "flew back and hurt my back."  *Id*.  Fegley received physical therapy treatment for his neck and shoulder but stated it did not help.  *Tr.* 79.  Fegley further described the pain in his right shoulder as "pinching" and "sharp," but not constant.  *Id*.  He stated that he feels pain when lifting or moving things with his arm.  *Id.*

Fegley testified that he also has issues with his left bicep and left wrist.  He traces these injuries to an incident on January 14, 2006, while working for Direct TV.  Fegley fell off of a roof when his ladder slid on some ice.  *Tr.* 80 – 81.  He landed on his left arm and wrist, and he was treated and released from the hospital on the same day.  *Tr.* 81.  Fegley testified that the injury made his arm very weak, and he is unable to lift with his left arm or lean on his left wrist.  *Id.*  Further, his injury to his left wrist has impacted his sex life because he is unable to support himself.  *Id*.  Fegley stated that the weakness in his left arm is constant, and he

15

must use his right hand to lift things.  *Id.*  Fegley also testified that no surgery has been recommended for his left arm.  *Tr.* 82.

In addition to the aforementioned injuries, Fegley also testified that he suffers from a left ankle injury that he received while working for Direct TV.  *Tr.* 83.  Fegley attested that he fell down the stairs and twisted his ankle and has "rolled over" on his ankle several times and his ankle "gives out" on him.  *Id.* Fegley testified that he has not had surgery on his ankle, as it was not recommended by a doctor.  *Id.*

Fegley also testified that he sees a therapist.  *Tr.* 85.  He stated that he feels "worthless" because he cannot support his family.  Fegley discussed how active he was prior to his injuries, stating that he enjoyed running and currently owns over $3,000 in sports equipment that he can no longer use.  *Tr.* 87.  Fegley sees his therapist once a week and is prescribed Lexapro for his depression.  *Id.*

Fegley testified that his typical day starts at approximately eight or nine o'clock in the morning and it is difficult to get out of bed and stand up.  *Tr.* 88.  He is able to walk down the stairs to eat breakfast and, on occasion, his wife brings the food up to him.  *Tr.* 88-89.  He testified that he has some difficulty getting dressed and that his wife helps him at times.  Fegley stated that his wife does most of the cooking, but admited that he is capable of making a sandwich or toast.  *Tr.* 89.

16

Fegley testified that he spends part of the day watching TV while lying on the couch or in bed. *Id.* Fegley stated that he helps with some household chores, such as folding clothes and accompanying his wife shopping for groceries, but needs to lean on the cart while he shops with his wife. *Tr.* 90-91. Further, he is unable to do the dishes and does not cut the grass or shovel snow. *Tr.* 91.

Prior to going to bed, Fegley helps his children with their homework if they need it. *Id.* He is usually in his bedroom at approximately 9PM and tries to get in bed by 11PM. *Id.* Fegley testified that it is difficult for him to fall asleep and stay asleep due to the pain in his back and other parts of his body. He is prescribed Ultram and Flexerill to help him sleep, but he stated that it does not always work. *Tr.* 91-92. Fegley sleeps approximately four to five hours each night. *Tr.* 92.

Fegley ended his testimony by discussing some of the hobbies that he can no longer do because of his injuries. He specifically mentioned running, lifting weights, basketball, football, and baseball. *Id.* Fegley also stated that he takes his children hunting. *Id.* Although he does not shoot, he is able to facilitate and teach his children how to hunt now that they are old enough. *Tr.* 93. He admitted to taking his children hunting on the last Saturday of deer season, which was in December 2010. *Id.*

**D.  Testimony of Vocational Expert.**

Mitchell Schmidt, an impartial VE, was present at Fegley's hearing.  The VE testified that, based on the limitations set forth by the ALJ, Fegley could not do any of his past work.  *Tr.* 97.  The ALJ presented the VE with three hypotheticals involving an individual of Fegley's age, education, and work experience.  He asked the VE whether or not the first hypothetical individual would be able to perform light and exertional level work if he had the following abilities:

> [L]ift and carry 20 pounds occasionally and 10 pounds frequently. Would only be able to stand and walk two hours of an eight-hour workday.  Would be limited to frequent bilateral upper extremity push/pull.  Occasional lower extremity left pedal control.  This hypothetical individual would be afforded the sit/stand option at approximately every 20 to 30 minutes.  Be limited to occasional bending, balancing, stooping, kneeling, crouching and crawling. Occasional ramps and stairs with no ladders, ropes or scaffolds. Further, there'd be no exposure to vibration or machines that cause vibration.  No exposure to hazardous conditions such as unprotected heights, dangerous machinery or uneven surfaces.  Further, the hypothetical individual would be limited to simple, routine tasks involving no more than simple, short instructions, simple work-related decisions, with few work place changes.  There should be no work at production rate pace, assembly line fast-pace type work.

*Tr.* 96-97.

The VE testified that based on the first hypothetical, the individual could perform other jobs that existed in the national or regional economy.  *Tr.* 97. Specifically, the VE stated that the individual could do some light and sedentary jobs that are defined as "posturally material."  *Id*.  The VE testified that these types

18

of jobs would allow individuals to be productive if they were sitting or standing. *Tr.* 98.

The VE testified that the hypothetical individual could perform light and sedentary jobs, and that the job of "garment sorter," DOT code 222.687-014, would be available. *Id.* This job is light duty and unskilled at specific vocational preparation ("SVP") level two.[3] The VE stated that approximately 1,000 of these jobs exist in central Pennsylvania, including Center County, and approximately 1.4 million of these jobs exist in the national economy. *Id.* The VE further testified that the hypothetical individual could perform the occupation of "folder," DOT code 686.685-030. *Id.* This job is light duty and unskilled at SVP level two. The VE stated that approximately 400 of these jobs exist in the region, and 600,000 of these jobs exist in the national economy. *Id.* The VE also testified that the hypothetical individual could perform the occupation of "cuff folder," DOT code 685.687-014. *Id.* This job is sedentary and unskilled at SVP level two. The VE stated that approximately 300 of these jobs exist in the region, and 475,000 of these jobs exist in the national economy. *Id.* The VE further testified that the hypothetical individual could perform the occupation of "surveillance systems

---

[3] Specific vocational preparation ("SVP") means the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. The SVP levels range from one (short demonstration) to nine (over 10 years). 20 C.F.R. § 656.3.

monitor," DOT code 379.367-010.  *Id*.  This job is sedentary and unskilled at SVP level two.  The VE stated that approximately 450 of these jobs exist in the region, and 525,000 of these jobs exist in the national economy.  *Id*.

Next, the ALJ presented the VE with a second hypothetical that provided a further limitation of frequent handling and fingering.  The VE testified that all of the aforementioned jobs would be available to this hypothetical individual.  *Tr.* 99.  When asked by the ALJ whether jobs would be available to the same hypothetical individual who was also limited to no handling and no fingering with the left non-dominant hand, the VE testified that the job of "surveillance system monitor" would still be available to this individual.   *Id*.

Fegley's attorney added additional limitations to the hypothetical individual for the VE to consider.  Specifically, Fegley's attorney asked the VE to further limit the individual to occasional fingering and handling with the right hand.  This limitation did not change the VE's opinion regarding the individual's ability to perform as a surveillance systems monitor.  Fegley's attorney further limited the individual to occasional bilateral upper extremity reaching and pulling and asked if that would change the VE's position.  The VE responded, "no."  *Tr.* 102.  Finally, Fegley's attorney limited the hypothetical individual to no more or less than four hours sitting and less than four hours standing and walking in a typical eight-hour workday.  *Id.*  Fegley's attorney asked the VE if it could be correct to say that this

individual would not have any available jobs that he could perform.   The VE responded, "yes." *Id.*

## IV.  DISCUSSION.

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators – the ALJ and this Court. Once the ALJ has made a disability determination, it is the responsibility of this Court to independently review that finding.  This task requires the application of a specific, well-settled and carefully articulated standard of review.  Congress has specifically provided that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

The "substantial evidence" standard of review prescribed by statute is a deferential standard of review.  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).   When reviewing the denial of disability benefits, we must simply determine whether the denial is supported by substantial evidence.  *Brown v. Bowen,* 845 F.2d 1211, 1213 (3d Cir. 2008).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *see also Pierce v. Underwood,* 487 U.S. 552

(1988).   It is less than a preponderance of the evidence but more than a mere scintilla of proof.  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)).

A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  However, in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the decision] from being supported by substantial evidence."  *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).   Furthermore, in determining if the ALJ's decision is supported by substantial evidence, the court may not parse the record but rather must scrutinize the record as a whole.  *Smith v. Califano,* 637 F.2d 968, 970 (3d Cir. 1981).

## A. The Weight Ascribed by the ALJ to the Medical Opinions was Supported by Substantial Evidence.

"The ALJ must consider all of the relevant evidence and give a clear explanation to support his or her findings when determining the residual functional capacity."  *Isaac v. Colvin*, Civil No. 3:12-1120, 2014 WL 1942555 * 5 (M.D. Pa.

May 14, 2014) (citing *Burnett v. Comm'r*, 220 F.3d 112, 121 (3d Cir. 2000)).

When evaluating opinions by a treating source, it is well-established that the ALJ

accord treating physicians' reports great weight, especially when such opinions

reflect expert judgment based on a continuing observation over an extended period

of time.  *See Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000); *Plummer*, 186

F.3d at 429 (*quoting Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)).  This

preference for opinions by treating sources is manifest in the Regulations, which

provide that:

> if [the ALJ] find[s] that a treating source's opinion on the issue(s) of
> the nature and severity of [a claimant's] impairment(s) is well-
> supported by medically acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the other substantial evidence
> in [the claimant's] case  record, [the ALJ] will give it controlling
> weight.

20 C.F.R. § 404.1527(c)(2); *see also* SSR 96-2p.

Finding that the medical opinion of a treating source is not entitled to

controlling weight does not mean the opinion should be rejected.  SSR 96-2p.  In

many cases, a treating source's non-controlling medical opinion will be entitled to

great deference.  *Id.*  Where no medical opinion is entitled to controlling weight

under the Regulations, the probative weight of all non-controlling opinions by

treating sources, nontreating sources, and nonexamining sources is evaluated based

on several factors.  Pursuant to 20 C.F.R. § 404.1527(c), non-controlling medical

opinions must be weighed based on: (1) the length of treatment and frequency of

23

examination; (2) the nature and extent of the treatment relationship; (3) the

opinion's support by medical evidence; (4) the opinion's consistency with the

record as a whole; and (5) the treating physician's specialization.  In addition, the

ALJ must consider any other factors that tend to support or contradict the opinion.

20 C.F.R. § 404.1527(c)(6).

In *Morales v Apfel*, the Court of Appeals for the Third Circuit set forth the

standard for weighing opinions by treating, nontreating, and nonexaminaing

physicians, stating that:

> Where...the opinion of a treating physician conflicts with that of a
> non-treating, non-examining physician, the ALJ may choose whom to
> credit but "cannot reject evidence for no reason or for the wrong
> reason."   *Plummer*, 186 F.3d at 429 (*citing* [*Mason*, 994 F.2d at
> 1066]).  The ALJ must consider the medical findings that support a
> treating physician's opinion that the claimant is disabled.   *See*
> *Adorno[v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994)].  In choosing to
> reject the treating physician's assessment, an ALJ may not make
> "speculative inferences from medical reports" and may reject "a
> treating physician's opinion outright only on the basis of contradictory
> medical evidence" and not due to his or her own credibility
> judgments, speculation or lay opinion.  *Plummer*, 186 F.3d at 429;
> *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988); *Kent [v.
> Schweiker*, 710 F.2d 110, 115(3d Cir. 1983)].

225 F.3d at 317-318.

Fegley takes issue with the ALJ's evaluation of the medical evidence,

arguing that the ALJ failed to ascribe the appropriate weight to Drs. Renaud,

Murray, and Wolf.[4]  Fegley first argues that the ALJ did not incorporate all of Dr.

Renaud's assessments and references a Physical RFC Questionnaire completed by

Dr. Renaud on June 3, 2011.  *Tr.* 572-575.  Fegley asserts that Dr. Renaud found

that he would need unscheduled breaks for 10-15 minutes every one to two hours

due to Fegley's neck, back and shoulder pain.  *Id*.  Fegley argues that the ALJ

erred in rejecting Dr. Renaud's opinion regarding unscheduled breaks.  *Doc.* 7.

The ALJ gave Dr. Renaud's opinion great weight, except for his finding that

Fegley was limited regarding unscheduled breaks.[5]  The ALJ found that Dr.

Renaud's opinion regarding unscheduled breaks was inconsistent with his own

findings and with other clinical and diagnostic studies in the record.  *Tr.* 51.

Further, the ALJ found that the unscheduled break limitation was not supported by

---

[4]     Fegley references various clinical observations and findings of Dr. Renaud, often merely contrasting such findings with the ALJ's determinations without argument regarding a specific error in the ALJ's determination.  Because our review is limited to whether substantial evidence supports the Commissioner's findings, we have focused on what we believe are Fegley's main arguments of error.

[5]     We note that the ALJ was not required to afford Dr. Renaud's opined limitations significant weight.  Physical therapists are not considered an "acceptable medical source" to "provide evidence to establish an impairment." 20 C.F.R. § 404.1513(a).  Rather, physical therapists are considered "other sources" which the ALJ may look to "show the severity of [a claimant's] impairment(s) and how it affects [his] ability to work." *Id.* at § 404.1513(d).  "Although statements from a physical therapist may be considered as additional evidence, they are not entitled to controlling weight." *Jones v. Colvin*, Civil Action No. 13-4831, 2014 WL 2862245, *11 (E.D. Pa. June 24, 2014) (citing *Hatton v. Comm'r*, 131 F. App'x 877, 878 (3d Cir. 2005)).

the opinions of other doctors in the record and inconsistent with the record as a whole. *Id.*

Regarding the internal inconsistency in Dr. Renaud's assessment, on the June 3, 2011 RFC Questionnaire, he checked the box indicating that Fegley will "sometimes" need unscheduled breaks. *Tr.* 574. Yet, on the same form, he undercuts this observation by stating that he is unable to accurately answer the functional limitation questions regarding how long Fegley can walk, sit and stand in an eight hour workday because he has not seen him since July of 2010.[6] *Tr.* 573. Further, our review of the record confirms that no other acceptable medical source of record opined or concluded that Fegley required unscheduled breaks.

Fegley also argues that some of Dr. Renaud's clinical observations, such as positive slump and straight leg test with limited lumbar range of motion, bending limitation, antalgic gait, and limited activities of daily living support his position that the ALJ erred in the weight afforded to Dr. Renaud's assessment regarding unscheduled breaks. *Doc.* 7 at 10, *Doc.* 9 at 4. The Commissioner contends that such pieces of evidence demonstrate a limited range of motion and an antalgic gait, which were adequately accounted for in the ALJ's RFC. *Doc.* 8 at 9. We agree

---

[6] Fegley also takes issue with the ALJ's remark that Dr. Renaud's June 3, 2011 Questionnaire was not a functional capacity evaluation. However, as we have discussed, and as the record confirms, Dr. Renaud declined to fill out the functional limitation section of the Questionnaire because he had not seen Fegley in approximately one year.

and further find that such observations contained in treatment and progress notes merely reflect Dr. Renaud's observations on a given day, and, in some instance, are belied by Fegley's admitted activities of daily living.  Thus, based on our review of the record, we are satisfied that substantial evidence supports the ALJ's conclusion to exclude the unscheduled break limitation opined by Dr. Renaud from the RFC finding.

Fegley further asserts that Dr. Murray's May 18, 2010, opinion that he should "never" bend, *Tr.* 413, was not considered or discussed by the ALJ.  He further contends that if this bending limitation had been incorporated into the hypothetical questioning of the VE, it may have significantly eroded the occupational base available to Fegley.  We find these arguments to be an insufficient basis for remand.  Although Dr. Murray checked the box for "never" regarding Fegley's ability to bend, *Tr.* 413, he specifically noted in the same consultative examination that Fegley had the ability to bend over at a 30-degree angle.  *Tr.* 409.  Moreover, Dr. Renaud's opinion that Fegely could rarely stoop (bend), *Tr.* 574, around the same time period, July 2010, is inconsistent with the box checked by Dr. Murray that he could never bend. Such inconsistencies in the record justify the ALJ's lack of incorporation of a complete prohibition on bending and support the decision to limit Fegley to occasional bending in the RFC. Moreover, while the ALJ does not provide detail on the bending limitation, he

acknowledges that Fegely has issues with back and hip range of motion and refers specifically to Dr. Murray's medical source statement and assessment. *See Tr.* 49. Because the ALJ's decision to limit Fegley to occasional bending in the RFC is supported by evidence in the record, we find that a remand would not alter the ALJ's determination.

Additionally, based on the ALJ's hypothetical the VE responded that the individual could perform "light and sedentary" jobs that are "posturally material." *Tr.* 97. The VE offered four occupations that met the limitations provided in the hypothetical: garment sorter, folder, cuff folder, and surveillance systems monitor. According to the Dictionary of Occupational Titles, these occupations do not require one to perform postural activities such as stooping or crouching. *See* DICOT 222.687-014, 1991 WL 672131; DICOT 686.685-030, 1991 WL 678300; DICOT 685.687-014, 1991 WL 678284; DICOT 379.367-010, 1991 WL 673244. Any error resulting from the ALJ's lack of discussion of the bending limitation was, therefore, harmless.

Finally, Fegley argues that the Appeals Council erred in dismissing documents submitted to them from counsel regarding Fegley's physical condition. *Doc.* 7 at 8. Specifically, Fegley references an RFC Questionnaire completed by Dr. Wolf on August 14, 2012, *Tr.* 586-590, and other provider records dated during the 2011-2012 time period, *Tr.* 20-38. Fegley asserts that these documents should

28

have been considered by the Appeals Council because they reasonably relate back to the time period reviewed by the ALJ.  *Id*. To the contrary, we agree with the Appeals Council that such documents refer to office visits and procedures that occurred subsequent to the date Fegley was last insured.[7]

Where the record reveals that there was new and additional evidence developed by a claimant following the ALJ hearing, several other legal considerations come into play.  42 U.S.C. § 405(g) provides that:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

In order to support a "new evidence" remand, however, the evidence must: (1) be new; (2) be material; (3) demonstrate a reasonable possibility that it would change the outcome of the case; and, (4) the Plaintiff must demonstrate good cause for not having incorporated new evidence.  *See e.g. Scatorchia v. Comm'r of Soc. Sec*, 137 F. Appx. 468, 472 (3d Cir. 2005).  "An implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent

---

[7]     The Appeals Council found, and Fegley does not dispute, that even though Dr. Wolf states in the August 14, 2012 RFC Questionnaire that his description of Fegley's symptoms and limitations relates back to February 2010, there is no indication in the record that Dr. Wolf examined Fegely between February 1998 and February 2012.  *Tr.* at 2.

deterioration of the previously non-disabling condition." *Szubak v. Secretary of Health and Human Services*, 745 F.2d 831, 833 (3d Cir. 1984).

Our review of the documents submitted to the Appeals Council reveals that the "new" medical evidence submitted by Fegley's counsel to the Appeals Council consists of subsequent treatment sought, and imaging studies performed, after the date of last insured in this matter. The documents, therefore, are not material to the relevant time period evaluated by the ALJ in his decision.[8]

## B. The ALJ's Evaluation of Fegley's Subjective Complaints and Credibility is Supported by Substantial Evidence.

Fegley argues that the ALJ failed to properly evaluate his subjective complaints and thus his credibility determination was flawed. The Commissioner contends that substantial evidence supports the ALJ's findings in this regard.

The ALJ was not required to accept Fegley's claims of limitations. Although the ALJ must explain the reasons for his credibility determinations, *Schonewolf v. Callahan*, 972 F. Supp. 277, 286 (D.N.J. 1997), in general, the ALJ is in the best position to evaluate a claimant's and his or her witness's credibility and such determinations are entitled to great weight and much deference and will

---

[8]    Fegley's contention that the ALJ's reliance on Dr. Sherbondy is misplaced because he never examined or treated Fegley's lower back or neck, *Doc.* 7 at 11, ignores contrary evidence in the record and is without merit. *See Tr.* at 318, 516, 522, 526.

not be disturbed if there is substantial supporting evidence to support those findings. *See Van Horn v. Schweiker,* 717 F.2d 871, 873 (3d Cir.1983) (providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make); *see also Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 801 (10th Cir.1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility.").

A claimant's allegations of pain and other subjective symptoms also must be supported by objective medical evidence, *Hartranft*, 181 F.3d at 362, and any "inconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that some or all of the claimant's testimony about her limitations or symptoms is less than fully credible." *Garret v. Comm'r of Soc. Sec.*, 274 Fed. Appx. 159, 164 (3d Cir. 2008)(citing *Burns v. Barnhart,* 312 F.3d 113, 129-30 (3d Cir. 2002)).

The Social Security Rulings and Regulations provide a further framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529; SSR 96-4p; SSR 96-7p. Symptoms such as pain will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529(b). Once a

medically determinable impairment that results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work.  *Id.*  In so doing, the medical evidence of record is considered along with the claimant's statements.  *Id.*

Guided by the foregoing legal requirements and benchmarks, we find that Fegley's subjective complaints were not borne out by the record, and thus, we are satisfied that the ALJ's evaluation of Fegley's credibility was supported by substantial evidence.  The ALJ reviewed the medical records, clinical and objective findings and properly considered Fegley's reports to his physicians and examiners and testimony at the hearing.  *Tr.* 50.  The ALJ found Fegley's statements concerning the intensity, persistence, and limiting effects of his impairments not credible because they were inconsistent with the RFC assessment.  *Id.*

In supporting his credibility finding, the ALJ pointed to discrepancies between Fegley's reported and testified to limitations and contradictory medical evidence and testimony regarding activities of daily living.  Despite his self-reported limitations with walking, sitting, lifting, playing sports, driving, using stairs, putting on shoes and socks, bending over, squatting, reaching, stair climbing, and using his hands, *Tr.* 239-246, the ALJ found, and our review of the record supports, that the clinical and objective medical findings failed to

corroborate the alleged degree of functional limitations. *Id.* 50.[9]   The ALJ properly

found no evidence of muscle atrophy on any physical examination, concluding that

Fegley "moves about on a fairly regular basis." *Id.*  Moreover, the ALJ

specifically cited to medical evidence in the record showing "normal peripheral

pulses, no neurologic deficit, normal reflexes, normal sensation, normal elbow,

wrist, hand, left shoulder, and knee ranges of motion, basically normal shoulder

range of motion, no motor deficit, normal gait, normal grip strength, heel and toe

walking ability, clear lungs, a regular heart rate and rhythm, and no edema." *Tr.*

49-50 (stating that medical examiners who examined Fegley between a year before

January 14, 2006, and the date of last insured, September 30, 2010, reported

findings that were inconsistent with Fegley's alleged limitations); *see also* SSR-96-

7p ("One strong indication of the credibility of an individual's statements is their

consistency, both internally and with other information in the case record.")

Furthermore, the ALJ found that Fegley's reported and testified to activities

of daily living undermined his credibility.   The ALJ found, and the record

supports, that Fegley is able to make basic meals for himself, help his wife fold

laundry, pay bills, assist his wife with grocery shopping, drive, and help his

children with their homework. *Tr.* at 50.  Further, Fegley testified that he is able to

---

[9]     Fegley's argument that in utilizing the phrase "debilitating symptomatology"
the ALJ created his own pain standard is without merit.  When read in context, the
phrase merely refers to Fegley's complaints of debilitating symptoms.

take his children hunting, even though he does not shoot and stays close to the road.   Finally, the ALJ remarked on the apparent lack of treatment, other than hot baths and medication that was not reported by Fegley to cause side effects or that was not altered, either in type or dosage, due to side effects.  *Id*.

We, therefore, find that the ALJ's analysis of the Fegley's subjective complaints, and conclusion that his subjective complaints were not credible, is well-reasoned and supported by substantial evidence.

### C. The ALJ's Hypothetical was Properly Formulated.

An ALJ must exercise care when formulating proper hypothetical questions to VEs who opine about the availability of work for a particular claimant.  In this regard, the controlling legal standards are clear, and clearly defined.  As the United States Court of Appeals for the Third Circuit has observed:

> Discussing hypothetical questions posed to vocational experts, we have said that "[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments."  *Podedworny*, 745 F.2d at 218.   A hypothetical question posed to a vocational expert "must reflect *all* of a claimant's impairments."  *Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir. 1987)(emphasis added).  Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence.  *Podedworny*, 745 F.2d at 218 (citing *Wallace v. Secretary of Health and Human Servs.*, 722 F.2d 1150, 1155 (3d Cir. 1983).

*Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002).

However, the Third Circuit has clarified that the ALJ is not required to submit to the VE every impairment alleged by a claimant. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). "Instead . . . hypotheticals posed must "accurately portray" the claimant's impairments and that the expert must be given an opportunity to evaluate those impairments 'as contained in the record.'" *Id.* at 554. Thus, the hypothetical question must encompass only those impairments that are medically established, which in turn means that the ALJ must accurately convey to the VE all of a claimant's "*credibly established limitations.*" *Id.*

Fegley argues that the ALJ failed to include in his hypothetical all of the limitations assessed by Drs. Renaud, Murray, and Wolf. Specifically, Fegley takes issue with the ALJ for not placing the limitations of never bending and unscheduled breaks into his hypothetical. Fegley further argues that the ALJ erred in formulating his hypothetical by failing to account for Fegley's testimony regarding his limitations. The Commissioner contends that the ALJ did not err in formulating his hypothetical, as it was based on a "very generous, detailed, and thorough RFC finding that accounted for all of [Fegley's] credibly established limitations." *Doc.* 8 at 15.

Based on our review of the record, we find that the ALJ took all of Fegley's credibly established impairments into account when questioning the VE. *Tr.* 96-

97.  As we have found, *supra*¸ the ALJ did not err in his decisions to exclude from the RFC an unscheduled break limitation opined by Dr. Renaud and a complete prohibition on bending.   Additionally, we have found that substantial evidence supports the ALJ's credibility determination.  We, therefore, find no error in the hypothetical posed to the VE by the ALJ in this case.

## V.  RECOMMENDATION.

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the decision of the Commissioner be AFFIRMED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.   The briefing requirements set forth in Local Rule 72.2 shall apply.   A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 12th day of  September 2014

/s/ Susan E. Schwab
Susan E. Schwab
United States Magistrate Judge